UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

---

AUTISM SOCIETY OF MICHIGAN and
MICHIGAN PROTECTION AND ADVOCACY
SERVICE, INC.,

                                          Plaintiff,

v.                                                                    CIVIL ACTION NO: 5:05-CV-0073

Ronald FULLER, in his official capacity as                            HON. GORDON J. QUIST
Superintendent, Parchment School District;
Charles NICHOLSON, in his official
capacity as Principal, Parchment High
School; Robert CHAMPION, Nancy
LENZ, Larry REEVES, Steve GIBSON,
Deb SULLIVAN, Roberto AGUIRRE, and
Joel SHAFFER, in their official capacities
as members of the PARCHMENT SCHOOL
DISTRICT School Board,

                                          Defendants.

---

## SECOND AMENDED COMPLAINT

## I. PRELIMINARY STATEMENT

1.      This is an action for declaratory and injunctive relief brought by Autism Society of Michigan

(hereinafter referenced as ▲SM@ under the due process clauses of the United States and

Michigan Constitutions, Section 504 of the Rehabilitation Act of 1973, and the Americans

with Disabilities Act.

2.      Defendants have in the past and will in the future deprive certain students with disabilities of

their liberty interests based on the injuries resulting from their use of personal restraints on

students.  In addition, the Defendants have discriminated against students with disabilities in

particular by using personal restraints on them, based on their disabilities and/or

misperceptions about their disabilities.

## II. JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. ▪▪ 1331 and 1343(a)(3)-(4).

4.      This action is also authorized by 28 U.S.C. ▪▪ 2201-2202 and by 42 U.S.C. ▪ 1983.

5.      Venue is appropriate in this District because Defendants are located in this district and because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## III.   PARTIES

6.      Plaintiff ASM is a non-profit organization, incorporated under the laws of the State of Michigan.  ASM▪ serves a membership of 1,075 to assure full participation and self determination for individuals with autism spectrum disorder (hereinafter referenced as ▪Autism▪▪  ASM stresses self advocacy and advocating on behalf of others in ways that value equity, respect, dignity and diversity in all communities.

7.      ASM provides leadership in supporting the education and employment of persons with autism, through advocacy for families, facilitating and writing Person-Centered Plans, and contact with schools, including attendance at Individualized Education Plan meetings, education consultation, and technical assistance to schools.   ASM has long extended its limited resources to address the injuries, denial of education and discrimination against its members due to the use of restraints in schools.

8.      ASM has adopted the mission statement which is attached hereto as Exhibit 3.  That mission is further explained on ASM's web site under the headings "The Vision Behind the Mission," which is attached hereto as Exhibit 4, and "About the Autism Society of Michigan," which is attached hereto as Exhibit 5, which shows that ASM's activities include

2

provision of training in the use of Positive Behavior Support in  lieu of personal restraint.

9.    ASM represents and serves the entire population of students with Autism Spectrum Disorder in the state of Michigan.  That population reached 7,062 in 2004 for the state of Michigan. As of January 31, 2005, 171 students in Kalamazoo County school districts had the autistically impaired label.  800 persons with Autism Spectrum Disorder were being served by Kalamazoo Community Mental Health system as of January 31, 2005.

10.    ASM received a grant from Greater Kalamazoo United Way to serve residents of that area during the period of February 1, 2004 through January 31, 2005.  During that period, ASM responded to 309 requests for information and providing 40 referrals for residents of Kalamazoo County.

11.    For the period of February 1, 2004 through January 31, 2005, ASM provided training for 54 residents of Kalamazoo County.  This training specifically addressed the negative effects of using physical restraint, particularly on students with autism.  The trainings also included information on assessment of and ways to address challenging behaviors by students with autism without resorting to the use of restraints.

12.    ASM's Board of Directors has considered the use of restraints in schools on numerous occasions, including its January 11, 2003 board meeting, the March 1, 2003 board meeting, the November 22, 2003 board meeting, the January 17, 2004 board meeting, the March 28, 2004 board meeting, the May 22, 2004 board meeting, the September 11, 2004 board meeting, the October 23, 2004 board meeting, the November 20, 2004 board meeting, and the January 8, 2005 board meeting.

13.    For several years, ASM has provided information to its membership regarding the use of

3

restraints.  In January 2004 and August 2004, ASM wrote to the membership about the use of restraints in Parchment in particular.

14.   Beginning on March 1, 2004 and continuing to present, ASM's Executive Director has participated on a planning committee and a larger referent group formed by the Michigan Department of Education to address the use of seclusion and restraints in schools.  This group has worked together regularly since March 2004 to create a draft policy entitled "Supporting Student Behavior: Standards for the Emergency Use of Seclusion and Restraint."

15.   ASM Board of Directors member Tricia Luker has also participated on a planning committee and a larger referent group formed by the Michigan Department of Education to address the use of seclusion and restraints in schools, beginning on March 1, 2004 and continuing to present.

16.   ASM Executive Director Sally Burton Hoyle, then-President of ASM Board of Directors Richard McNally and ASM Board member Tricia Luker participated in discussions with Kalamazoo Regional Educational Service Agency ("KRESA") and Parchment School District attorneys regarding the plaintiff's request that both KRESA and Parchment School District adopt polices and provide training concerning the use of personal restraints on students at their schools, between  January 2004 and July 2004.

17.   ASM has members who live throughout the state of Michigan, including the area served by KRESA and Parchment School District.  At least six (6) of those members live in Kalamazoo, Michigan and at least three (3) of those members live in Portage, Michigan, located in Kalamazoo County. The majority of these members have a child or children or

other relative with autism, each of whom is being served by KRESA.

18.  The primary placement for high school students with autism served by KRESA is at Parchment High School, a school operated by the Defendants.

19.  Members of ASM and their children, many of whom have been diagnosed with autism, have been subjected to the use of physical restraints in schools and may be subjected to the use of physical restraints in schools in the future, thereby exposing them to risk of physical injury, emotional trauma, loss of education, discrimination and harassment based on their disabilities.

20.  ASM represents members whose children could attend Parchment School District in the future.  In addition, present and future students of  Parchment  School District who have been diagnosed with autism  are constituents of ASM.  These current and future students have suffered and/or could suffer in the future an injury that would allow then to bring suit in their own right.

21.  One member of ASM, Bruce Mills, resides at 2001 Greenlawn Avenue, Kalamazoo, Michigan, 49006, and has a son with autism.  Mr. Mills is concerned that without a clearly stated policy and training plan regarding the use of restraints in schools, individuals with autism remain at risk in public schools.  His son attended an Autistic-Impaired ("AI") classroom for approximately one half day during the 2004-2005 school year at Schoolcraft Public Schools.  Mr. Mills believes that it is reasonable and necessary for school districts, including Parchment School District, to provide a clear policy in relationship to the use of restraint and to require the training to assure that students and school personnel remain safe.

22.  One member of ASM, Ann Yurcek, resides at 5864 Blue Jay Drive, Kalamazoo, Michigan,

49009.  Ms. Yurcek believes that restraint should only be used to protect the person with autism, other students, and/or staff by a trained individual and that if restraint is necessary, its use should be reported to the students' parents.  She is also concerned that without a clearly stated policy and training plan, individuals with autism remain at risk in public schools.  Ms. Yurcek has a daughter who is currently 15-years-old, and who has been diagnosed with various medical conditions which render her entitled to special education services.

23.  Medical professionals have recommended that Ms. Yurcek's daughter should be placed in an autism intervention room for delivery of education services.  When her daughter was receiving special education services at a Kalamazoo middle school, she was restrained by staff there. The use of restraint on her was very traumatic for her. After that experience, her daughter is reluctant to attend a public school, particularly if restraint is used on students at that school.  Ms. Yurcek has not agreed to her daughter's placement in an autism intervention room at this time because for students in the Kalamazoo School District, the autism intervention room for high school students is operated by KRESA at Parchment High School.  Ms. Yurcek does not feel comfortable placing her daughter at a program at Parchment High School because she believe that school district does not provide adequate training for its staff and does not have an adequate policy regarding the use of restraint.

24.  ASM's board of directors includes members who are family members of persons with autism receiving educational services in Michigan public schools.

25.  Plaintiff Michigan Protection & Advocacy Service, Inc. (hereinafter "MPAS") is a private, non-profit agency established pursuant to the Protection and Advocacy for Individuals with

Mental Illness Act (hereinafter "PAIMI Act"), 42 U.S.C. §10801 *et seq.*, the Developmentally Disabilities Assistance and Bill of Rights Act, (hereinafter "PADD Act") 42 U.S.C. §15041 *et seq.*, and the Protection & Advocacy for Individual Rights Act. (hereinafter "PAIR Act"), 29 U.S.C. § 794e.  MPAS is incorporated under the laws of the State of Michigan and is designated by the Governor of the State Michigan to function as the protection and advocacy system within this state, pursuant to the PAIMI Act, the PADD Act, and the PAIR Act.

26.   As the protection and advocacy system for the State of Michigan, MPAS advocates for the rights of all persons with mental illness and developmental disabilities within the state.  This advocacy includes providing information and referrals on a variety of issues including the use of restraint in schools, training on a variety of topics including the use of restraints in schools and special education in general, and investigation of potential instances of abuse or neglect.  MPAS staff members also participate in groups which have worked to develop policies, procedures and legislation regarding the use of restraints in school, including the Michigan Department of Education referent group created in March 2004.

27.   Since August 2003, MPAS has been contacted by at least five (5) families from Kalamazoo County whose children have received special education services through KRESA.  At least two of those children attended the AI room located at Parchment High School and at least 4 of those children had been personally restrained at school.

28.   Defendant Ronald Fuller is the superintendent of the Parchment School District.  As such, all executive and supervisory authority of the Parchment School District rests with him, including responsibility and supervision of formulating the policies, practices and procedures

to ensure the safety, health and welfare of students at Parchment School District.  Defendant Fuller is being sued for actions and omissions under the color of state law.  At all material times, Defendant Fuller was acting within the course and scope of his employment and under the color of state law.

29.    Defendant Charles Nicholson is the Principal of Parchment High School.  As such, all executive and supervisory authority of the Parchment High School rests with him. Defendant Nicholson is being sued for actions and omissions under the color of state law.  At all material times, Defendant Nicholson was acting within the course and scope of his employment and under the color of state law.

30.    Defendants Robert Champion, Nancy Lenz, Larry Reeves, Steve Gibson, Deb Sullivan, Roberto Aguirre, and Joel Shaffer, are members of the school board for Parchment School District.  Parchment School District is a Michigan public school that, in addition to its other responsibilities, provides for and arranges for educational services, supports or other assistance for individuals with mental illness and individuals with developmental disabilities, including children with autism.

## IV.  FACTUAL ALLEGATIONS

### Use of Restraints by Defendants

31.    M.R.L. was an African American boy with autism.

32.    M.R.L. died on August 25, 2003, while being restrained by employees of Parchment School District and KRESA.  He was 15-years-old when he died.

33.    For portions of the semesters in the fall of 2002 and the spring of 2003, and on August 25, 2003, M.R.L. was enrolled as a student of KRESA with placement in the Autism Intervention

room located at Parchment High School.

34. In the fall of 2002 and spring of 2003, M.R.L. came home from Parchment High School on several occasions with buttons missing, tears in his shirt and/or scratches or bruises on his body.

35. When M.R.L.'s mother, Elizabeth Johnson, contacted his teacher, Melanie Giddings, and Defendant Nicholson about these incidents which caused injury to M.R.L., the school representatives dismissed her concerns and failed to investigate the incidents.

36. According to Judy Murphy, M.R.L.'s assigned one-to-one aide, he was physically restrained for an extended period of time on one occasion while a student at Parchment High School in the spring of 2003.

37. August 25, 2003 was the first day of school at Parchment High School. On that date, just prior to the time of his death, M.R.L. was attending a general education choir class with his aide, Judy Murphy, at Parchment High School.

38. Employees of Defendants Parchment High School and KRESA employees (hereinafter referenced as "school employees") report that at approximately 12:30 p.m. on August 25, 2003, while M.R.L. was attending choir class, he engaged in activities described as having a seizure.

39. A short time after the activities described in paragraph 38 above, school employees began to physically restrain M.R.L.

40. School employees report that M.R.L. was physically restrained by school employees for approximately 60 to 70 minutes.

41. During the time in which he was restrained, M.R.L. was placed in the prone position, on his

9

stomach, with KRESA and Parchment High School employees holding his shoulders and legs down, holding his hands behind his back, and placing a knee in his lower back.

42.   The Parchment High School employees who physically restrained M.R.L. included  George C. Stamas, Parchment High School Assistant Principal, and  Brett A. Kiel, Parchment High School employee.

43.   During at least some of the time during which M.R.L. was restrained, Defendant Nicholson, Parchment High School Principal, was present in the room where he was being restrained.

44.   There is no report or evidence that M.R.L.'s vital signs, including respiration and pulse, were checked or that M.R.L. was offered fluids or given an opportunity to use the toilet during the first sixty (60) minutes of M.R.L.'s restraint.

45.   After being restrained for approximately 45 minutes, at about 1:35 p.m., Assistant Principal Stamas noticed that M.R.L. had become non-responsive.

46.   While M.R.L. was still being restrained, family friends and emergency contacts Bruce Martin and Phyllis Wall arrived at Parchment High School to pick him up.

47.   At approximately 1:47 p.m., Defendant Nicholson called M.R.L.'s mother and stated that M.R.L. might need to go to the hospital and that she needed to come to the  school to pick him up.

48.   School employees report that even after M.R.L. became non-responsive, he was  restrained for about fifteen (15) more minutes, until approximately 1:50 p.m. During this time as many as four school employees were holding M.R.L. face down on the floor, one holding M.R.L.'s hands behind his back and with his knee pressing downward on M.R.L.'s back.

49.   During the time during which M.R.L. was restrained after he became non-responsive,

10

Bruce Martin asked the school employees three times why M.R.L. was still being restrained when he was not moving.

50. At approximately 1:50 p.m., Phyllis Wall checked to see whether M.R.L. was breathing, and when she determined that he was not, she asked that the school employees stop restraining him and she initiated cardio pulmonary resuscitation (CPR).

51. No employee of Parchment High School ever initiated CPR after it was determined that M.R.L. was not breathing.

52. At approximately 1:55 p.m., Defendant Nicholson instructed another Parchment High School employee to call 911.

53. No employee of Parchment High School called 911 until approximately 1:57 p.m., approximately 23 minutes after M.R.L. had become non-responsive. This was only after Ms. Wall requested that 911 be called.

54. When emergency personnel arrived at the school shortly after 2:00 p.m., approximately 75 minutes after the restraint of M.R.L. began, M.R.L. was not breathing and had no pulse.

55. M.R.L. was transported to the hospital by ambulance and was pronounced dead at 2:50 p.m., approximately two hours after his restraint began.

56. The cause of M.R.L.'s death was determined by the coroner to be prolonged physical restraint in prone position associated with extreme mental and motor agitation.

57. There was no clear and present immediate danger to M.R.L. or to others to warrant the use of personal restraints on him on August 25, 2003.

58. School employees did not employ or attempt to employ any positive behavior supports or less restrictive alternatives prior to using personal, prone restraint on M.R.L. on August 25,

11

2003.

59.     The restraint of M.R.L. on August 25, 2003 was for the convenience of school employees

        and/or for the purpose of discipline.

60.     The Defendants and their employees knew or should have known that personal restraint

        should only be used by properly trained staff, and that prone restraint in particular is a

        dangerous form of personal restraint, and that the professional standards for restraint use

        require that it be used only as a last resort after de-escalation is attempted, and standing and

        wall restraints are attempted.

61.     All Defendants and their employees knew or should have known that cardiac arrest and

        positional asphyxia are known risks of prone restraint.

### Lack of Training and Policy

62.     None of the Parchment or KRESA employees involved in the restraint of M.R.L. had

        been trained appropriately in the use of personal restraints.

63.     Defendants failed to ensure that the school employees involved in the restraint of M.R.L. and

        other students were trained in the use of personal restraints, and failed to warn those school

        employees of the dangers of cardiac arrest and positional asphyxia in the use of prone

        restraints.

64.     In a letter dated September 3, 2003, Parchment=s attorney Richard D. Fries admitted that the

        school district had Ano records of training received by staff in the use of restraint and

        seclusion.@ A copy of that letter is attached hereto as Exhibit 1.

65.     The use of restraints was not part of M.R.L.=s Individualized Education Program (AIEP@),

        and had not otherwise been approved or condoned by his mother, Elizabeth Johnson.

66.     The Parchment High School Code of Student Conduct for Elementary and Secondary
        Schools, the relevant section of which is attached hereto as Exhibit 2, prohibits the use of
        corporal punishment, defined as Athe deliberate infliction of physical pain by hitting,
        paddling, spanking, slapping or any other physical force used as a means of discipline.@That
        code goes on to state that a school employee Amay use reasonable physical force upon a pupil
        as necessary to maintain order and control in a school or school-related setting for the
        purpose of providing an environment conducive to learning.@

67.     In August 2004, KRESA adopted a procedure regarding the use of restraints in school, a
        copy of which is attached hereto as Exhibit 6.  That procedure, in combination with
        additional training being provided to KRESA employees, addresses many of the Plaintiff's
        concerns regarding the use of restraint raised in this complaint.

### Prevalence and Dangers of Using Restraints

68.     Plaintiff ASM placed the question AHave you or your child ever been restrained or
        placed in a time out room at school?@ on its web site in the fall of 2003. 147 persons
        responded to that survey, including at least 30 Michigan residents, and 64% of those
        Michigan respondents responded Ayes.@

69.     Two Government Accounting Office (AGAO@ Reports have studied the dangers of
        physically restraining children, and issued two reports in 1999.  One report, entitled
        AImproper Restraint of Seclusion Use Places People at Risk,@stated that Athe use of restraint
        and seclusion represents a significant risk@to individuals with mental illness or mental
        retardation in residential settings.  The risk is the same for children with developmental
        disabilities including autism.

13

70.    The second GAO report, entitled "Extent of Risk From Improper Restraint or Seclusion is Unknown," concluded that restraint and seclusion can be dangerous because restraining people "can involve physical struggling, pressure on the chest, or other interruptions in breathing."

71.    An article entitled "Practicing Restraint" by Scott Kirkwood, published in October 2003 by the Child Welfare League, explains that certain restraint positions can result in positional asphyxia which occurs when a person=s body position interferes with respiration, resulting in suffocation.  When a person is held in a prone restraint, with force applied to the shoulders and chest, chest expansion is seriously restricted or prevented, preventing the diaphragm from moving and therefore restricting or preventing inhalation.  This danger is exacerbated if the restrained person has just engaged in physical exertion.

72.    An article by Paul Schmidt and Thomas Snowden, "The Effects of Positional Restraint on Heart Rate and Oxygen Saturation," 17 Journal of Emergency Medicine 777 (1999), concludes that all persons placed in physical restraint should be positioned on their side or seated as soon as possible to facilitate the monitoring of their alertness, respiration, and pulse.  Schmidt and Snowden advise that monitoring should be vigilant and should include basic life signs and EKG and oxygen saturation. Such restraint devices should be removed as soon as it is possible and safe.

73.    Donald Reay explained in his study of positional asphyxia that in the prone position, effective abdominal excursions produced by contraction of the diaphragm are reduced and the tidal volume of respiration is substantially reduced, can lead to hypercapnia and hypoxemia.  "Positional Asphyxia During Law Enforcement," American Journal of Forensic

14

Medicine and Pathology, 13(2):90-97 (1992).

74. Child Welfare League of America=s ("CWLA") Best Practice Guidelines for Behavior Management 44 (2002), state that the following practices are prohibited: Apressure or weight on chest, lungs, sternum, diaphragm, back or abdomen, causing chest compression (i.e., positional or restraint associated asphyxiation).@ The guidelines go on to state that staff should receive special training in the observation of all types of restraints and seclusion and should closely monitor the person being restrained at least every 15 minutes. CWLA also states that restraint-associated asphyxia can be avoided by making sure that the restrained child can, or is allowed to, breathe.

75. In November 1998, the Joint Commission on Accreditation of Health Care Facilities (JCAHO) issued a Sentinel Event Alert which reviewed 20 restraint-related deaths.  The cause of death was asphyxiation in 40 % of those cases.  The Alert stated that Ar]estraining a patient in prone position may predispose the patient to suffocation.@

76. The Crisis Prevention Institute provides training for many providers of care who might engage in the restraint of children.  Their brochure, ARisks of Restraints@ specifically designates the use of prone restraint as a high risk position for restraint-related positional asphyxia.

77. In 1993, the Michigan Department of Education issued Standards for Policy and Procedure Development in the Use of Behavioral Interventions which regulates that:

   a. The deliberate infliction of physical pain by hitting, paddling, spanking, slapping, or any other physical force as a means of discipline is unlawful.

   b. The use of restraints cannot be for the convenience of staff or as a substitute

for an educational program.

    c.     The use of restraints should only be included in a behavioral intervention plan when the student presents a clear and present danger to himself or to others, or is engaging in severe destruction of property, and only when less restrictive measures and techniques are not deemed to be effective.

    d.     Schools should adopt appropriate guidelines and restrictions on the use of  restraint procedures to assure the dignity and safety of the student.

78.    Based on the information outlined above and the available training and additional available on this topic, the dangers inherent in the use of personal restraints were known or  should have been known to the defendants before the death of M.R.L.

79.    Based on the information outlined above and the available training and additional available on this topic, as well as the death of M.R.L., the dangers inherent in the use of personal restraints are currently known or should have been known to the Defendants since the death of M.R.L.

80.    Despite this knowledge of the risk of the use of personal restraints by staff who are untrained, unsupervised, and lacking in guiding policy on the use of personal  restraints      and      in alternatives to the use of personal restraints, the defendants have refused and failed to adopt appropriate policies and procedures and to adequately train and supervise their staff.

81.    On December 22, 2004, Michigan Protection & Advocacy Service, Inc. filed a complaint with the Michigan Department of Education asking that the department investigate the failure of the defendants to provide training, supervision and an adequate policy regarding the use of personal restraint.

82.   On or about February 7, 2005, the Department of Education issued a final state level investigation report in response to the December 2004 complaint which determined that the Michigan Department of Education does not have the authority to rule on the validity of such allegations.  The report also stated that there were no further administrative appeals available on that matter.

## V.  CAUSES OF ACTION

83.   Plaintiff hereby incorporates paragraphs one (1) through eighty-two (82) as though fully set forth herein.

84.   Employees of Parchment School District were acting under the color of state law since all were and still are public employees who were acting within the scope of their duties.

85.   Parchment School District receives federal funds to support its education programs, including its special education programs.

86.   The KRESA and Parchment School District employees who physically restrained M.R.L. and other students stood in an *in locus parentis* relationship with these students, or at least maintained a special relationship recognized to exist between a student and teacher with those students.

### Liberty Interest

87.   The use of personal restraint on M.R.L. and other students with autism and other disabilities who are not  posing a threat to themselves or others, constitutes the use of excessive physical force, violates those students= interest in life, freedom from seizure, and/or liberty interests under the Fourth and Fourteenth Amendments of the United States Constitution, and the Michigan Constitution, and thereby creates a cause of action pursuant to 42 U.S.C. ▪ 1983.

17

88.   The Parchment School District employees who restrained M.R.L. showed deliberate indifference to his serious medical needs and used excessive physical force which restricted his liberty, caused him extreme physical pain and led to his death.

89.   Employees of Parchment School District and the individual Defendants knew or should have known that the use of prone restraints on M.R.L. and other students who have been restrained carried a reasonably foreseeable risk of restraining their liberty, and causing serious bodily injury, psychological trauma, and/or death.

90.   The decision to restrain M.R.L. without any threat posed to himself or others, or any destruction of property, and the continuation of the restraint of M.R.L. for at least fifteen (15) minutes after he became unresponsive by employees of Parchment School District, with the approval of the individual named Defendants, suggests that the restraint was inflicted with malice or sadism.

91.   The individual Defendants and other employees of Parchment School District knew or should have known that positive behavior supports and less intrusive and harmful methods to control student behavior were available and should have been used in lieu of full personal restraints on M.R.L. and other students who have been restrained.

92.   Parchment School District, through the individual Defendants, approved and/or condoned the use of full personal restraint on students by allowing their employees to participate in the restraint of M.R.L. and an unknown number of other students with disabilities

93.   The broad corporal punishment policy in place and the use of personal restraint on students including M.R.L. and an unknown number of other students with disabilities by employees of Parchment School District shows that the Defendants had a practice, policy or custom of

reckless indifference to known or suspected abusive treatment of students, including students with disabilities.

94.     Defendant Superintendent Fuller and Principal Nicholson failed to adequately supervise and oversee their employees who have used personal restraint on students attending their schools, resulting in the use of excessive force against M.R.L. and other students with disabilities.

95.     Defendants failed to adequately train and supervise its administrators, teachers' aides, and other staff in the use of personal restraints and other behavior modification techniques, resulting in the use of excessive force against M.R.L. and other students with disabilities.

96.     Defendants have failed to adequately supervise and oversee their employees by ensuring that their administrators, teachers and aides did not use personal restraints which threaten the well being of students in their schools, resulting in the use of excessive force against M.R.L. and other students with disabilities.

97.     As the result of this lack of supervision, training and policy direction from the Defendants, Parchment schools are inherently a dangerous environment for any student with a disability, especially those students with autism.

98.     Michigan=s Revised School Code, Mich. Comp. Laws Ann. '380.1312(3), prohibits the infliction of corporal punishment Aunder any circumstances.@ A school employee Amay use **reasonable** physical force upon a pupil as necessary to maintain order and control in a school ....@ Id. at '380.1312(4) (emphasis added)

99.     Previous court decisions, Michigan law, regulations and policies have put these Defendants and their employees on notice that in public schools, physical punishment which is not

disciplinary in nature or which is disproportionate to the need presented constitutes an abuse of official power.

100. Extensive scientific, public policy and government publications have put these Defendants and their employees on notice that the use of prone restraint poses a significant risk of injury or death and therefore is disproportionate to the need presented by students in need of behavior modification, and therefore constitutes an abuse of official power.

101. The use of prone personal restraint by the Defendants and their employees on M.R.L. and other students with disabilities was and is beyond the scope of professionally acceptable choices for managing the behavior of students.

## Discriminatory Treatment

102. Both Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. ' 794(a) (ASection 504"), and the Americans with Disabilities Act, 42 U.S.C. ' 12132 (AADA@), prohibit discrimination against a disabled person on the basis of their disability.

103. Section 504 states that:

> [n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, ... be subjected to discrimination under any program or activity receiving Federal financial assistance.

> 29 U.S.C. ' 794(a).

104. Title II of the ADA states with regard to public entities, which includes public schools, that:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the Benefits of the services, programs, or activities of a public entity or be subject to discrimination by any such entity.

> 42 U.S.C. ' 12132.

105. M.R.L. and possibly other students with disabilities who have been restrained at the

20

Defendants=schools have or had disabilities which significantly limited their life activities, entitling them to the protections of Section 504 and the ADA.

106.   M.R.L. and possibly other students with disabilities who have been restrained were at all relevant times otherwise qualified to continue as students at the Defendants=schools.

107.   During the times in which these disabled students were being restrained, they were excluded from or otherwise denied the benefits of the Defendants=schools=regular educational programs.

108.   Parchment High School employees subjected M.R.L. and possibly other students with disabilities to personal restraints because of their disabilities and/or the perceptions or misconceptions surrounding those disabilities, and thereby  discriminated against those students on the basis of their disability.

109.   Parchment High School employees harassed M.R.L. and possibly other disabled students on the basis of their disabilities, by subjecting them to the pain and humiliation of personal restraints in view of other students and staff, and thereby discriminated against those students on the basis of their disability.

110.   The Defendants harassed M.R.L. on the basis of his disability, by  being deliberately indifferent to the circumstances leading up to his death, including the failure to employ less drastic methods to control his behavior or address the after effects of his alleged seizure, the continuation of personal restraint after he was in distress and then became non-responsive, and the failure to summon appropriate medical care, and thereby discriminated against him on the basis of his disabilities.

111.   The Defendants=employees harassed M.R.L. on the basis of his disability, by being

deliberately indifferent to, and failing to investigate, the previous incidents reported to them by M.R.L.=s mother in the fall of 2002 and spring of 2003,  and thereby discriminated against their students on the basis of their disabilities.

112.   The discriminatory treatment and harassment of M.R.L. represents either exercises of bad faith, gross misjudgments or gross departures from acceptable standards used among qualified professionals by the Defendants and their employees.

113.   Based on their past conduct, without further training and guidance from policies and procedures, Defendants' staff can be expected to continue to use personal restraint on students with disabilities in the future.

114.   Such a use of personal restraints on students with disabilities, including members of ASM, would violate the rights of those students under the U.S. and Michigan Constitutions, the Rehabilitation Act and the Americans with Disabilities Act.

115.   Because the Defendants have failed and refused to train staff and alter their policies regarding the use of personal restraints and the treatment of disabled students, Plaintiffs ASM and MPAS have no adequate remedy at law and injunctive relief is required.

116.   Plaintiffs ASM and MPAS will suffer irreparable harm without such injunctive relief.

117.   As a direct result of the foregoing, ASM=s and MPAS' constituents have suffered, continue to suffer and will likely suffer in the future the violation of their constitutional rights.

## VI.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs Autism Society of Michigan and Michigan Protection & Advocacy Service, Inc. requests that this Court issue the following relief:

A.      Issue a declaratory judgment that the Defendants have violated the constitutional

rights of ASM= constituents, and declaring further that the rights so violated are present rights which must be immediately respected by the Defendants;

B. Issue preliminary and permanent injunctive relief against the Defendants and their agents and employees enjoining them from depriving their students of their life and liberty interests by restraining them as a method of behavior control, to prevent further injuries or deaths caused by the unnecessary and improper use of personal restraints on current and future students of the Defendants;

C. Issue preliminary and permanent injunctive relief against the Defendants and their agents and employees requiring them to provide training in the use of alternative strategies and positive behavior supports to discipline or control student behavior in lieu of using personal restraints.

D. Issue preliminary and permanent injunctive relief against the Defendants and their agents and employees enjoining them from discriminating against disabled students by:

 i. denying access to a full education, using personal restraint or other forms of behavior control based on a student=s disability or employees=misperceptions about that disability,

 ii. allowing harassment on the basis of students= disabilities, and

 iii. failing to investigate reports of harassment of disabled students.

E. Award Plaintiff any additional relief as may be just, proper, and equitable, including reasonable attorney fees, litigation expenses, and costs pursuant to 42 U.S.C. ' 1988.

23

Respectfully submitted:


/s/ Stacy A. Hickox
Michigan Protection & Advocacy Service, Inc.
4095 Legacy Parkway, Suite 500
Lansing, MI 48911
(517) 487-1755