UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

AUTISM SOCIETY OF MICHIGAN and
MICHIGAN PROTECTION AND ADVOCACY
SERVICE, INC.,

                                    Plaintiffs,

v.                                                                        Case No. 5:05-CV-73

RONALD FULLER, in his official capacity as            HON. GORDON J. QUIST
Superintendent, Parchment School District;
CHARLES NICHOLSON, in his official
capacity as Principal, Parchment High School;
ROBERT CHAMPION, NANCY LENZ,
LARRY REEVES, STEVE GIBSON, DEB
SULLIVAN, ROBERTO AGUIRRE, and
JOEL SHAFFER, in their official capacities
as members of the PARCHMENT SCHOOL
DISTRICT SCHOOL BOARD,

                                    Defendants.
_____/

## OPINION

Plaintiff Autism Society of Michigan ("ASM") filed a complaint for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, against Defendant Ronald Fuller, in his official capacity as Superintendent of the Parchment School District; Charles Nicholson, in his official capacity as Principal of Parchment High School; and Robert Champion, Nancy Lenz, Larry Reeves, Steve Gibson, Deb Sullivan, Roberto Aguirre, and Joel Shaffer, in their official capacities as members of the Parchment School District School Board. ASM alleges that Defendants, in violation of the due process clause of the United States Constitution, have deprived students of their liberty interests in the past and will deprive students of their liberty interests in the future by permitting students to be personally restrained. (Second Am.

Compl. ¶ 2.)  Moreover, ASM alleges, "Defendants have discriminated against students with disabilities . . . by using personal restraints on them, based on their disabilities and/or misperceptions about their disabilities."  (*Id.*)  ASM requests a declaration that Defendants have violated the constitutional rights of ASM's constituents.  (*Id.* at VI. A.)  ASM further requests that this Court enjoin Defendants from depriving their students of their life and liberty interests by restraining them as a method of behavior control and require Defendants to provide training in the use of alternative strategies and positive behavior supports to discipline or control student behavior in lieu of using personal restraints.  (*Id.* at VI. B-C.)  Finally, ASM requests that this Court enjoin Defendants from discriminating against disabled students by "using personal restraint[s] . . . based on a student's disability."  (*Id.* at VI. D.)

Defendants moved pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss Plaintiff's complaint, arguing that Plaintiff failed to establish that it had standing to prosecute this claim.  Thereafter, ASM moved to amend its complaint to allege additional facts in support of its standing to maintain this claim and to add an additional party, Michigan Protection and Advocacy Service, Inc. ("MPAS"), which ASM maintains has standing to bring this claim on behalf of its constituents.  (Br. Supp. Mot. Am. Compl. at 2, 13.)  The Court granted ASM's motion to amend its complaint.  Defendants then filed a motion to dismiss Plaintiffs' Second Amended Complaint, arguing, again, that Plaintiffs' complaint must be dismissed for, even as amended, Plaintiffs have failed to establish standing to prosecute this claim.  For the following reasons, the Court will grant Defendants' motion to dismiss Plaintiffs' complaint for lack of standing.

## I.  FACTS

### A.     The Use of a Personal Restraint on an Autistic Student at Parchment High School

On August 25, 2003, M.R.L., a fifteen year old boy with autism, was enrolled as a student

of the Kalamazoo Regional Education Service Agency ("KRESA") with placement in the Autism Intervention ("AI") room located at Parchment High School ("Parchment"). (Second Am. Compl. ¶¶ 32-33.) On August 25, 2003, at approximately 12:30 p.m., M.R.L., while attending a general education choir class at Parchment High School, "engaged in activities described as having a seizure." (*Id.* at ¶¶ 37-38.) Plaintiffs allege that, in response to M.R.L.'s seizure, school employees began to physically restrain him. (*Id.* ¶ 39.) Specifically, Plaintiffs assert, school employees placed M.R.L. on his stomach in the prone position, held his shoulders and legs down, held his hands behind his back, and at least one employee placed his knees in M.R.L.'s lower back. (*Id.* at ¶ 41.) After being restrained for approximately 45 minutes, Plaintiffs allege, a school employee noticed that M.R.L. had become non-responsive. (*Id.* at ¶ 45.) Nonetheless, Plaintiffs assert, M.R.L. was not released until approximately fifteen minutes later when Phyllis Wall, an emergency contact for M.R.L., arrived and found that M.R.L. was not breathing. (*Id.* at ¶ 50.) Ten minutes later, emergency personnel arrived at the school and transported M.R.L. to the hospital. (*Id.* at ¶ 54-55.) Less than one hour later, M.R.L. was pronounced dead. (*Id.* at ¶ 55.) The coroner determined the cause of M.R.L.'s death to be "prolonged physical restraint in [the] prone position associated with extreme mental and motor agitation." (*Id.* at ¶ 56.)

**B**.   **Autism Society of Michigan (ASM)**

Plaintiff ASM is a non-profit organization, incorporated under the laws of Michigan, that "serves a membership of 1,075 to assure full participation and self determination for individuals with autism spectrum disorder." (Second Am. Compl. ¶ 6.) ASM does not define autism spectrum disorder in its complaint. The Court takes judicial notice, however, that autism has been defined as "a complex developmental disability that affects an individual in the areas of social interaction and communication." (http://www.autism-society.org/ (follow "About Autism" hyperlink)). "Autism,"

the definition continues, "is a spectrum disorder that affects each individual differently and to varying degrees of severity." (*Id*.)  Similarly, the National Institute of Mental Health explains that autism spectrum disorder "is defined by a certain set of behaviors," such as poor eye contact and loss of language or social skills "that can range from the very mild to the severe." (http://www.nimh.nih.gov/publicat/autism.cfm.)

ASM asserts that it "has long extended its limited resources to address the injuries, denial of education and discrimination against its members due to the use of restraints in schools." (*Id*. at ¶ 7.)  ASM explains that it received a grant from the Greater Kalamazoo United Way to serve residents of the Kalamazoo area from February 1, 2004, to January 31, 2005. (*Id*. at ¶ 10.)  During that period, ASM provided training to residents of Kalamazoo County that not only addressed the negative effects of using physical restraints on students with autism but also explained alternative methods of dealing with challenging behaviors by autistic students without resorting to the use of restraints. (*Id*. at ¶ 11.)  Moreover, ASM explains, for several years it has provided information to its membership regarding the use of restraints.  (*Id*. at ¶ 13.)  In January and August 2004, ASM wrote to its membership about the use of restraints at Parchment. (*Id*.)

ASM alleges that "[m]embers of ASM and their children, many of whom have been diagnosed with autism, have been subjected to the use of physical restraints in schools and may be subjected to the use of physical restraints in schools in the future." (*Id*. at ¶ 19.)  ASM asserts that it represents members whose children could attend Parchment. (*Id*. at ¶ 20.)  ASM asserts that Bruce Mills, who resides in Kalamazoo and has a son with autism, "is concerned that without a clearly stated policy and training plan regarding the use of restraints in schools, individuals with autism remain at risk in public schools." (*Id*. at ¶ 21.); (Mills Aff. at ¶ 4.)  Mills' son "attended an Autistic-Impaired classroom for approximately one half day during the 2004-2005 school year at Schoolcraft

4

Public Schools." (Mills Aff. at ¶ 6.) Mills believes "that it is reasonable and necessary for school districts to provide a clear policy in relationship to the use of restraint and to require . . . training to assure that students and school personnel remain safe." (Mills Aff. at ¶ 9.)

Another member of ASM, Ann Yurcek, who also resides in Kalamazoo, has a 15-year-old daughter "who has been diagnosed with various medical conditions . . . [that] render her entitled to special education services." (Second Am. Compl. at ¶ 22.) When Yurcek's daughter was 12 years old and receiving special education services at Portage Middle School, "she was restrained by staff there." (*Id.* at ¶ 23); (Yurcek Aff. at ¶ 7.) Although "[m]edical professionals have recommended that [Yurcek's daughter] be placed in an autism intervention room for delivery of education services," Yurcek has not agreed to her placement in an autism intervention room because, for high school students in the Kalamazoo School District, the autism intervention room is located at Parchment. (Second Am. Compl. at ¶ 23); (Yurcek Aff. at ¶ 9.) Yurcek "does not feel comfortable placing her daughter at Parchment High School because she believes that [the] school district does not provide adequate training for its staff and does not have an adequate policy regarding the use of restraints." (Second Am. Compl at ¶ 23.)

## C.    Michigan Protection and Advocacy Service, Inc. (MPAS)

Plaintiff MPAS is a private non-profit agency established pursuant to the Protection and Advocacy for Mentally Ill Individuals Act (PAMII), 42 U.S.C. §§ 10801-10851, and the Developmental Disabilities Assistance and Bill of Rights Act (DDBRA), 42 U.S.C. §§ 15001-15115. MPAS is incorporated under the laws of Michigan and is designated by the Governor to function as the protection and advocacy system within the state. (*Id.* at ¶ 25.) "As the protection and advocacy system for . . . Michigan," Plaintiffs allege, "MPAS advocates for the rights of all persons with mental illness and developmental disabilities within the state." (*Id.* at ¶ 26.) Since August 2003,

when M.R.L. was restrained at Parchment High School, Plaintiffs assert that five families from Kalamazoo County whose children have received special education through KRESA have contacted MPAS. (*Id.* at ¶ 27.) Plaintiffs' allege that "[a]t least two of those children attended the AI room located at Parchment High School and at least four of those children had been personally restrained at school." (*Id.*)

## II. DISCUSSION

### A. Standard of Review

"For purposes of ruling on a motion to dismiss for want of standing, . . . the . . . [C]ourt must accept as true all material allegations of the complaint, and [it] must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 95 S. Ct. 2197, 2206 (1975). "Having invoked the jurisdiction of the federal courts, however, it is the plaintiff's burden to demonstrate that jurisdiction is proper." *COB Clearinghouse Corp., v. AETNA U.S. Healthcare, Inc.,* 362 F.3d 877, 881 (6th Cir. 2004) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136 (1992)); *Warth*, 422 U.S. at 498, 98 S. Ct. at 2205 (noting that since federal jurisdiction is limited by Article III, the plaintiff's standing to sue is "the threshold question in every federal case").

### B. Standing Principles

The Supreme Court has explained "that the irreducible constitutional minimum of standing contains three elements:"

> First the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. [And t]hird, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136 (internal quotation marks and alterations omitted).

An organization or association may establish standing to bring an action in federal court in either one of two ways.  First, an organization may allege standing as a representative of its members.  *Warth*, 422 U.S. at 511, 95 S. Ct. at 2211.  The Supreme Court has recognized that:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977).  An organization may also assert standing "on its own behalf because it has suffered a palpable injury as a result of the defendant's actions."  *MX Group v. City of Covington*, 293 F.3d 326, 332-333 (6th Cir. 2002); *see also Warth*, 422 U.S. at 511, 95 S. Ct. at 2211 ("There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.").

## C.    Application

### 1.    ASM's Representational Standing

ASM first asserts that it has standing to maintain this claim as representative of its members, Bruce Mills and Ann Yurcek, whom, it claims, would have standing in their own right to bring this action against Defendants.[1]  Bruce Mills has an autistic son who attended Schoolcraft Upper

---

[1] In Plaintiffs' brief, ASM claims that it has identified three members that would have standing in their own right to bring this action against Defendants.  Attached to Plaintiffs' brief in opposition to Defendants' motion to dismiss is an affidavit from Beth Smith who avers that she is a member of ASM, that she has a son entitled to special education services, that her son was restrained by staff at Portage elementary school, and that, although medical professionals recommend that her son be placed in an autism intervention room, she has not agreed to her son's placement in an autism intervention room because the one her son could attend is located at Parchment.  Since Plaintiffs do not allege in their *complaint* that Beth Smith is a member of ASM and that Defendants' alleged illegal conduct has injured or is immediately likely to injure her, and since Defendants present simply a facial attack to Plaintiffs' complaint, the Court need not consider Beth Smith's allegations in supporting ASM's claim that it has representational standing to bring this action.  However, since the substance of Beth Smith's affidavit is essentially identical to Ann Yurcek's affidavit, even if the Court were to consider her affidavit, it would not change the Court's analysis as to whether ASM has representational standing to pursue this claim.

elementary for approximately one half day during the 2004-2005 school year and plans to attend Schoolcraft Middle School.  (Second Am. Compl. ¶ 21.) (Mills Aff. ¶¶ 1, 6, 7.)  Mills avers that he believes "that it is reasonable and necessary for school districts to provide a clear policy in relationship to the use of restraint and to require . . . training to assure that students and school personnel remain safe."  (Second Am. Compl ¶ 21) (Mills Aff. ¶ 10.)

Ann Yurcek has a daughter who is entitled to special education services.  (Second Am. Compl. ¶ 22.)  While attending Portage Middle School, Yurcek's daughter was restrained by staff there.   (Second Am. Compl. ¶ 23); (Yurcek Aff. ¶ 7.)   While medical professionals have recommended that her daughter be placed in an autism intervention room for delivery of education services, Yurcek has not agreed to her daughter's placement in an autism intervention room because, for high school students in the Portage School District, the autism intervention room is located at Parchment.  (Second Am. Compl. ¶ 23); (Yurcek Aff. ¶¶ 8, 9.)  Yurcek does not feel comfortable placing her daughter at Parchment because she believes that the school district does not provide adequate training for its staff and does not have an adequate policy regarding the use of restraints. (Second Am. Compl. ¶ 23); (Yurcek Aff. ¶ 10.)

Plaintiffs argue that these members face a real and immediate threat of injury by the possibility that their children could be personally restrained at Parchment if they were to attend Parchment.  In support of Plaintiffs position that ASM has standing to bring this action on behalf of these members, Plaintiffs first attempt to analogize this case to *Friends of the Earth, Inc., v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 120 S. Ct. 693 (2000), wherein the Supreme Court found that Friends of Earth ("FOE") had standing to bring its claim as representative of its members who sufficiently alleged injuries in fact.  Plaintiffs contend that, as in *Laidlaw*, where, they maintain, plaintiff Kenneth Lee Curtis was "barred" from using a river near his house because of

8

defendant Laidlaw's conduct, the children of these ASM members are, similarly, effectively barred from going to Parchment High School because of the possibility that they might be personally restrained there.

Plaintiffs' attempt to analogize this case to *Laidlaw* is unconvincing.  In *Laidlaw*, the South Carolina Department of Health and Environmental Control granted defendant Laidlaw Environmental Services ("Laidlaw") a permit to discharge treated water into the North Tyger River. *Id*. at 175-76, 120 S. Ct. at 701.  "The permit . . . placed limits on Laidlaw's discharge of several pollutants into the river, including . . . mercury . . . ."  *Id*. at 176, 120 S. Ct. at 701.  Laidlaw's discharges, however, consistently exceeded the limits set on mercury discharges. *Id*.  Consequently, FOE filed a citizen suit against Laidlaw under § 505 of the Clean Water Act.  *Id*. at 177, 120 S. Ct. at 702.  "Laidlaw moved for summary judgment on the ground that FOE failed to present evidence demonstrating injury in fact, and therefore lacked Article III standing to bring the lawsuit."  *Id*. Specifically, Laidlaw argued that FOE failed to show that any of its "members sustained or faced the threat of any 'injury in fact' from Laidlaw's activities" since, as the district court found, "there had been 'no demonstrated proof of harm to the environment' from Laidlaw's mercury discharge."  *Id*. at 181, 120 S. Ct. at 704.

In addressing Laidlaw's argument that FOE failed to establish standing, the Court first noted that "Congress authorized the federal district courts to entertain Clean Water Act suits initiated by 'a person or persons having an interest which is or may be adversely affected.'"  *Id*. at 173, 120 S. Ct. at 700 (quoting 33 U.S.C. §§ 1365(a), (g)).  The fact that Laidlaw's discharges caused no demonstrated harm to the environment did not compel the conclusion that FOE's members did not suffer an injury in fact, the Court reasoned, for such a conclusion would "raise the standing hurdle higher than the necessary showing for success on the merits" of the underlying suit.  *Id*. at 181, 120

S. Ct. at 704.  Rather, the Court explained, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'" *Id.* at 183, 120 S. Ct. at 705.  Kenneth Lee Curtis, a member of FOE, averred "that he lived a half-mile from Laidlaw's facility; that he occasionally drove over the North Tyger River, and that it looked and smelled polluted; and . . . that he would like to fish in the river at a specific spot he used as a boy, but that he would not do so now because of his concerns about Laidlaw's discharges." *Id.* at 181-82, 120 S. Ct. at 704.  The Court concluded that these averments were sufficient to establish an injury in fact to Curtis because he lived near, drove over, and in the past recreated in the affected area, and the area's aesthetic and recreational values were lessened as a result of Laidlaw's conduct. *Id.* at 183-84, 120 S. Ct. at 706-06.

In *Lujan v. Defenders of Wildlife*, 504 U.S. at 564, 112 S. Ct. at 2138, in contrast, the Court concluded that the plaintiff organizations lacked standing to bring their claim as representative of their members for they failed to identify any member who suffered an injury in fact from the defendant's conduct.  Plaintiffs' "claim to injury," the Court explained, was that the Secretary of the Interior's failure to consult with other federal agencies "with respect to certain funded activities" of those agencies "abroad 'increase[d] the rate of extinction of endangered and threatened species.'" *Id.* at 562, 112 S. Ct. at 2137.  Plaintiff organizations identified two members whom they claimed suffered injuries in fact. *Id.* at 563, 112 S. Ct. at 2138.  These members, in the past, had traveled abroad to view the habitats of endangered species and to attempt to directly view the endangered species. *Id.*  These members claimed that the Secretary's conduct injured them because, although they had no current plans to visit the habitats again, they intended to do so.  They maintained that the Secretary's conduct threatened these habitats, which, consequently, threatened the endangered

species themselves, thus making it less likely that they would be able to view the endangered species in the future on their return trip. *Id*.

The Court found that these allegations contained "no facts . . . showing how damage to the species" that the members hoped to observe would "produce imminent injury to" these members. *Id*. at 564, 112 S. Ct. at 2138. That the members professed "an intent to return to the places they had visited before," the Court opined, "is simply not enough" to establish an actual or imminent injury. *Id*. "Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be," the Court concluded, "do not support a finding of the 'actual or imminent' injury that our cases require." *Id*.

In this case, even assuming, as Plaintiffs allege, that the possibility that a student might be restrained at Parchment alleges a "real and immediate" threat of injury, ASM has failed to allege that any of its members either attend or have any concrete plans to attend Parchment. Bruce Mills' affidavit, for instance, fails to even mention Parchment. Although Ann Yurcek's affidavit states that "[m]edical professional have recommended that [her daughter] be placed in an autism intervention room," and that she has not agreed to place her daughter in an autism intervention room because it is located at Parchment, she does not aver that she has any concrete plans of sending her daughter to Parchment (or, for that matter, even that she desires to send her daughter to Parchment). This case is not analogous to *Laidlaw* where Kenneth Lee Curtis sufficiently alleged an injury in fact, not because Laidlaw's conduct in any sense "barred" him from using the affected area, but rather because he actually lived near and used the area that Laidlaw's conduct adversely affected. Here, again, assuming that the possibility that a student might be restrained at Parchment demonstrates a "real and immediate" threat of injury, the complaint fails to allege that any member of ASM is likely to imminently suffer from the complained of conduct, for there is no allegation that any member

11

attends Parchment or even has plans to attend Parchment.

More significantly, however, ASM's claim that it has representational standing to bring this claim fails for, even if it had identified a member's child who attended Parchment, the possibility that the student may be restrained there does not demonstrate a real and immediate threat of injury sufficient to establish standing.  The Supreme Court's decision in *Los Angeles v. Lyons*, 461 U.S. 95, 103 S. Ct. 1660 (1983), compels this conclusion.  In *Lyons*, plaintiff Lyons alleged that Los Angeles city police officers stopped his vehicle for a traffic violation and that, although he "offered no resistance whatsoever, the officers, without provocation or justification, seized [him] and applied a 'chokehold' . . . rendering him unconscious . . . ."  *Id*. at 97, 103 S. Ct. at 1663.  Lyons further alleged that Los Angeles city police officers "routinely apply choke holds in innumerable situations where they are not threatened by the use of any deadly force . . . ."  *Id*. at 98, 103 S. Ct. at 1663. Lyons sought an "injunction against the City barring the use of . . . control holds."  *Id*.

Before specifically addressing whether Lyons had standing to maintain his claim for injunctive relief, the Court noted that an "[a]bstract injury" to a plaintiff is not enough for the plaintiff to invoke the jurisdiction of the federal courts.  *Id*. at 101, 103 S. Ct. at 1665.  Rather, "[t]he plaintiff must show that he . . . is immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct and the . . . threat of injury must be both real and immediate . . . ."  *Id*. at 101-102, 103 S. Ct. at 1665 (internal quotation marks omitted).  The Court noted that Lyons' "standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of . . . chokeholds by [Los Angeles city] police officers."  *Id*. at 105, 103 S. Ct. at 1667. The fact that "Lyons may have been illegally choked by the police" in the past, the Court explained, did "nothing to establish a real and immediate threat that he would again be stopped . . . by an officer or officers who would illegally choke him into unconsciousness without any provocation or

resistance on his part." *Id.* "In order to establish an actual controversy," the Court explained, "Lyons would have had not only to allege that he would have another encounter with the police but also . . . . that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter." *Id.* at 105-106. The Court reasoned that, even if Lyons had alleged such facts, it was "no more than conjecture to suggest that in every . . . encounter between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse." *Id.* at 108, 103 S. Ct. at 1668. Thus, the Court concluded, in light of the "speculative nature of Lyons' claim of future injury," Lyons lacked standing to bring his claim for injunctive relief. *Id.* at 111, 103 S. Ct. at 1670.

Similarly, here, even if ASM had identified a member's child who attended Parchment High School, the possibility that the student might be unlawfully restrained is "no more than speculation." *Id.* at 108, 103 S. Ct. at 1668. ASM has not alleged, and, indeed, could not allege, that in every encounter between a student and an employee at Parchment High School, the student is unlawfully restrained. Since ASM has failed to identify any member who, as the Supreme Court described, is "immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct," ASM's claim that it may prosecute its action as representative of its members fails. *Id.* at 101, 103 S. Ct. at 1665.

ASM maintains, however, that *Lyons* can be distinguished from the present case. ASM contends that Parchment "currently maintains a policy which permits staff to use deadly and improper restraint, as evidenced by the death of M.R.L." (Pls.' Br. Opp'n Defs' Mot. Dismiss Second Amended Compl. at 6.) It argues that because Parchment refuses "to provide training or develop a policy on the use of restraints, there is a strong likelihood that . . . [Parchment staff] will use improper and potentially deadly restraint on students with [autism]." This argument is simply

a reiteration of its claim and does not distinguish the case from *Lyons*. As noted above, the fact that

a student might be restrained in the future by a Parchment staff member, just as the fact that Lyons

might have been placed in a chokehold in the future by a police officer, does not establish a "real and

immediate" threat of injury.

Next, ASM agues that the Court should entertain this suit because the challenged conduct

"is capable of repetition, yet evad[es] review," for "the use of restraints in schools cannot be

predicted and lasts [only] for a short time . . . ." (*Id.* at 7.) Lyons raised this same argument in

attempting to establish that he had standing to maintain his claim for an injunction against the city.

461 U.S. at 109, 103 S. Ct. at 1669. The Supreme Court rejected it. *Id.* The Court first noted that

"Lyons' claim that he was illegally strangled remain[ed] to be litigated in his suit for damages." "In

no sense," the Court explained, did "that claim 'evade' review." *Id.* In this case, the only allegation

in Plaintiffs' complaint as to the actual use of an improper restraint upon a student at Parchment was

that Parchment staff improperly restrained M.R.L. Just as in *Lyons*, M.R.L.'s claim in no way evades

review as his estate was able to, and in fact did, bring an action for damages. *See Johnson v.

Parchment School District et al.,* 1:03-cv-917 (W.D. Mich. 2006). Moreover, the Supreme Court

explained, "the capable-of-repetition doctrine applies only in exceptional situations, and generally

only where the named plaintiff can make a reasonable showing that he will again be subjected to the

alleged illegality." 461 U.S. at 109, 103 S. Ct. at 1669. "As we have indicated" the Court continued,

Lyons did "not ma[ke] this demonstration." *Id.* Similarly, here, ASM has failed to identify any

member who has been improperly restrained at Parchment in the past, or any member who is

reasonably likely to be improperly restrained at Parchment in the future.

Finally, rather than attempting to directly distinguish *Lyons*, Plaintiffs cite a number of

district court cases they assert support their position that ASM has standing to bring this action as

representative of its members.  For instance, they attempt to analogize this case to *Doe v. Rowe*, 156 F. Supp. 2d 35 (D. Me. 2001).  In *Doe*, plaintiffs, three individuals with mental illness who were under guardianship, and the Disability Rights Center of Maine, a non-profit organization that "advocates for the legal and civil rights of Maine residents with mental disabilities," brought a suit challenging a Maine law that not only prohibited persons who were under guardianship for reasons of mental illness from voting in any election, but also subjected them to criminal prosecution if the mentally ill person under guardianship voted knowing he was subject to the prohibition.  156 F. Supp. 2d at 38, 41.  The plaintiffs argued that the law violated both the Fourteenth Amendment of the United States Constitution and Title II of the ADA.  *Id.* at 37.  In addressing the plaintiffs ADA claim, the Court noted that the plaintiffs needed to establish 1) that they were qualified individuals with disabilities, 2) that they were excluded from participating in a public entity's services, programs, or activities, or otherwise discriminated against, and 3) that such exclusion or discrimination was by reason of their disability.  *Id.* at 58.  The defendants argued that the plaintiffs could not bring this claim because "they actually ha[d] not been excluded from participation in voting."  *Id.*  The district court readily dismissed this argument, noting that the plain language of the challenged law precluded the plaintiffs from voting and subjected them to criminal prosecution if they voted knowing that they were prohibited from doing so.  *Id.*  The district court concluded that the plaintiffs did not need to "subject themselves to criminal liability in order to present a ripe ADA claim."  *Id.*

Plaintiffs argue here that, "[s]imilarly, [ASM members] should not be required to subject their children to potential injuries . . . from the use of personal restraint for . . . [them] to assert their interests in controlling the use of restraint [at Parchment]."  (Pls.' Br. Opp'n Defs.' Mot Dismiss Second Am. Compl. at 8.)  This argument, however, simply assumes what they need to establish:

15

that a member of ASM is reasonably likely to suffer a real and immediate injury.  In *Doe*, the plaintiffs, who desired to vote, suffered a real and immediate threat that they would be deprived of this right for, if they had attempted to vote, they would have been subject to criminal prosecution. In contrast, even assuming ASM identified a member who attended Parchment, the *possibility* that the member might be restrained at Parchment, again, does not establish a "real and immediate" threat of injury.

Plaintiffs also point out that, "[i]n numerous ADA Title III cases, courts have held" that if a plaintiff were to realistically visit or return to a "place of public accommodation" but for the fact that it is not ADA compliant, then the plaintiff has standing to seek injunctive relief to remedy the ADA violation.  *See Parr v. L. & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065 (D. Haw. 2000); *Small v. Gen. Nutrition Co.,* 388 F. Supp. 2d 83 (E.D. NY. 2005); *Johanson v. Huizenga Holdings, Inc.*, 963 F. Supp. 1175 (S. D. Fla. 1997).  Plaintiffs argue that ASM has standing because Ann Yurcek, an ASM member, could request admission into Parchment for her daughter, but has not done so for fear that she would be restrained there.  The cases cited by Plaintiffs do not demonstrate that a member of ASM faces a "real and immediate" threat of injury.  Unlike the cases cited, where the plaintiffs would realistically have confronted an ADA non-compliant place of accommodation and, thus, have suffered an injury in fact, it is simply pure speculation that any member of ASM would be restrained at Parchment.[2]

---

[2] Plaintiffs also claim that ASM members can establish "informational injury."  In support of this claim, Plaintiffs note that the Sixth Circuit has held that an environmental organization had representational standing to prosecute a claim on behalf of one of its members who alleged that the defendant's failure to report the pollution it discharged into a waterway as required by its NPDES permit injured him because "the lack of information deprived him of the ability to make choices about whether it was 'safe to . . . recreate in . . . [the] waterway.'"  *Am. Canoe Ass'n Inc. v. City of Louisa Water and Sewer Comm'n*, 389 F.3d 536, 542 (6th Cir. 2004).  Plaintiffs recognize that Michigan law provides that "[i]t is the natural, fundamental right of parents and legal guardians to determine and direct the care, teaching, and education of their children."  M.C.L. § 380.10.  Plaintiffs argue that ASM's members are "unable to make the choice to send their children" to Parchment "because of Defendants' use of personal restraints."  (Pls.' Br. Opp'n Defs.' Mot. Dismiss Second Am. Compl. at 5.)  Plaintiffs' contention that ASM members can establish informational injury is frivolous.  Unlike *American Canoe*, where a statute required the defendant to report the level of pollutants in

### 2. MPAS' Representational Standing

MPAS, as the designated protection and advocacy system in the State of Michigan, has standing pursuant to the Protection and Advocacy for Mentally Ill Individuals Act (PAMII), 42 U.S.C. §§ 10801-10851, the Developmental Disabilities Assistance and Bill of Rights Act (DDBRA), 42 U.S.C. §§ 15001-15115, and the Protection and Advocacy of Individual Rights Act (PAIR), 29 U.S.C. § 794e, to pursue legal remedies on behalf of its constituents. *See Doe v. Stincer*, 175 F.3d 879, 883-85 (11th Cir. 1999); *Tenn Prot. and Advocacy, Inc. v. Bd. of Educ. of Putnam County, Tenn.*, 24 F. Supp. 2d 808, 814-815 (M.D. Tenn. 1998). MPAS claims that its constituents consist of "all persons with mental illness and developmental disabilities within the state." (Second Am. Compl. ¶ 26.) In their complaint, Plaintiffs state that "MPAS has been contacted by at least five (5) families from Kalamazoo County whose children have received special education services through KRESA . . . [and] at least two of those children attended the AI room located at Parchment High School." (*Id.* at ¶ 27.) Apparently, then, from their complaint, Plaintiffs maintain that MPAS has representational standing to pursue this claim on behalf of those children who have received special education services through KRESA and attended the AI room located at Parchment.

Plaintiffs' claim that MPAS has representational standing to pursue this action on behalf of its constituents fails for the same reason ASM's claim that it had representational standing failed. That is, even if MPAS were able to identify a constituent who attends Parchment on whose behalf it would be entitled to pursue legal remedies, the possibility that an MPAS constituent might be improperly restrained at Parchment does not constitute a "real and immediate" threat of injury sufficient to confer standing for purposes of Article III. Rather, the injury is merely speculative.

---

its discharges and to make those reports available to the public, Plaintiffs have not cited any statute that requires Defendants to supply them with any information or reports.

*Lyons*, 461 at 101, 103 S. Ct. at 1665 (noting that for a plaintiff to maintain a claim for injunctive relief, he must demonstrate that he is "immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct").

Moreover, the Court has serious doubts that MPAS has even identified in its complaint a constituent on whose behalf it is statutorily entitled to pursue legal remedies. For instance, under the PAMII Act, protection and advocacy systems, such as MPAS,

> (1) [H]ave the authority to . . .
>> (B) pursue . . . . legal . . . remedies to ensure the protection of individuals with mental illness who are receiving care and treatment in the State; . . . and
>> (C) pursue . . . legal . . . remedies on behalf of an individual who . . . was an individual with mental illness . . . and is a resident of the state,
> but only with respect to matters which occur within 90 days after the date of the discharge of such individual from a facility providing care or treatment . . .

42 U.S.C. § 10805(1)(B),(C). MPAS does not allege in its complaint that it is bringing this action on behalf of a constituent with respect to matters that occurred within 90 days after the date the constituent was discharged from a facility providing mental illness treatment to the constituent.

The DDBRA provides that a protection and advocacy system "shall have the authority to . . . pursue legal . . . remedies . . . to ensure the protection of, and advocacy for, the rights of . . . [developmentally disabled] individuals within the State . . . ." 42 U.S.C. § 15043(a)(2)(A). "Developmental disability," the Act provides, "means a severe, chronic disability of an individual that . . . (i) is attributable to a mental or physical impairment . . . (ii) is manifested before the individual attains age 22, (iii) is likely to continue indefinitely, (iv) results in substantial functional limitations in 3 or more . . . major life activit[ies] . . ., and (v) reflects the individual's need for . . . assistance that . . . [is] of lifelong or extended duration . . . ." 42 U.S.C. § 15002(8)(i)-(v). Simply because a child receives special education services and attends an autism intervention room does not mean that the child is developmentally disabled as defined by the Act. Autism, for instance, is a

18

spectrum disorder that affects each individual differently, with the effects of the disorder ranging from the very mild to the severe.  Alleging that a child has autism, therefore, is not sufficient to establish that the child is developmentally disabled.

Finally, the PAIR Act provides that protection and advocacy systems shall "have the authority to pursue legal . . . remedies to ensure the protection of, and advocacy for, the rights of . . . [individuals with disabilities] within the State . . . ." 29 U.S.C. § 794e.[3]  The Act provides that a "disability" means "a physical or mental impairment that substantially limits one or more major life activities." 29 U.S.C. § 705(9).  Again, as explained above, simply alleging that a child receives special education services or has autism does not indicate that the child suffers from an impairment that substantially limits a major life activity.[4]

### 3.    ASM's Standing In Its Own Right

Finally, Plaintiffs assert that ASM has standing in its own right to bring this action under Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).  In support of this assertion, Plaintiffs first maintain that the broad enforcement provisions

---

[3] Congress explained that its purpose in enacting PAIR was to support protection and advocacy systems in each State "to protect the legal and human rights of individuals who . . . [were] ineligible for protection and advocacy programs under . . . [the DDBRA and the PAMII Act].  29 U.S.C. § 794e(a)(1)(B)(i)-(ii).

[4] Although Plaintiffs fail to identify in their complaint an MPAS constituent on whose behalf it has statutory standing to pursue legal remedies, in their brief, Plaintiffs note that the sheriff's report attached to its brief identifies a student, Heather Moskalik, who attends Parchment, suffers from Downs Syndrome, and has a comprehension level equivalent to that of a 1st grader. (Pls.' Br. Opp'n Defs.' Mot. Dismiss Second Am. Compl. at 4., Ex. 2)  Because Defendants present only a facial attack to the sufficiency of Plaintiffs' complaint, the Court need not consider the allegation that Moskalik is an MPAS constituent.  Defendants are not arguing that the facts Plaintiffs allege are untrue, but rather that the facts as alleged do not establish that Plaintiffs have standing to bring this action.  "In reviewing a facial attack, the Court applies the same standard applicable to Rule 12(b)(6) motions." *Tenn. Prot. and Advocacy*, 24 F. Supp. 2d at 812.  "Matters outside of the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss . . . [unless] those exhibits . . . can properly be considered incorporated by reference into the complaint and, thus, a part of the pleadings." *Weiner v. Klais and Company, Inc.*, 108 F.3d 86, 88-89 (6th Cir. 1997).  Plaintiffs' complaint does not reference the sheriff's report.  Therefore, it cannot properly be considered incorporated by reference into the complaint.  However, even if Plaintiffs had alleged that Moskalik attends Parchment and is properly an MPAS constituent under the DDBRA and the PAIR Act, MPAS' claim that it has representational standing would nonetheless fail for Moskalik does not face a "real and immediate" threat that she will be unlawfully restrained at Parchment.

of the ADA and Rehabilitation Act "evinces a congressional intention to define standing to bring a private action . . . as broadly as is permitted by Article III of the Constitution." *Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 47 (2nd Cir. 1997) (citation and internal quotation marks omitted). Plaintiffs maintain that ASM has Article III standing to bring this action in its own right for it has suffered an injury in fact that is "fairly traceable" to the challenged conduct, and it is "likely . . . that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136. In asserting that ASM has suffered an injury in fact, Plaintiffs rely upon *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S. Ct. 1114 (1982).

In *Havens*, three individuals and an organization, Housing Opportunities Made Equal (HOME), a non-profit corporation "whose purpose was to make equal opportunity in housing a reality in the Richmond, [Virginia], Metropolitan Area," brought a suit under § 812 of the Fair Housing Act against Havens Realty Corp., which operated two apartment complexes in the Richmond area, and a Havens' employee, alleging that they engaged in racial steering in violation of the Act. *Id.* at 366-368, 102 S. Ct. at 1118-1120 (internal quotation marks omitted). HOME alleged that it had standing to prosecute the FHA claim against defendants because, it maintained, defendants' racial steering practices injured it as an organization. *Id.* at 378-379, 102 S. Ct. at 1124-1125. Specifically, HOME asserted that defendants' racial steering practices frustrated "its efforts to assist equal access to housing through counseling and other referral services" and that, as a consequence, it "had to devote significant resources to identify and counteract . . . [defendants'] racially discriminatory steering practices." *Id.* at 379, 102 S. Ct. at 1124.

The Court noted that its "inquiry with respect to the standing issue[]" raised in this case was guided by its decision in *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S. Ct. 1601 (1979). In *Gladstone*, the Court concluded that Congress did not intend to limit the class of plaintiffs

20

that may bring a suit under § 812 to those who were direct victims of discrimination.  441 U.S. at 101-103, 99 S. Ct. at 1609.  Indeed, the Court explained, the operative language of § 812, which provides that the rights granted by the FHA "may be enforced by civil actions in appropriate United States district courts," "is phrased in the passive voice," and, thus, "contains no particular statutory restrictions on potential plaintiffs."  *Id.* at 102-103, 99 S. Ct. at 1609.  Therefore, the Court explained, so long as a plaintiff who pursues a claim under § 812 of the FHA sufficiently alleges an injury that is fairly traceable to the defendant's conduct, the plaintiff will have standing to pursue its claim.  *Id.* at 109, 99 S. Ct. at 1612; *Havens*, 455 U.S. at 376, 102 S. Ct. at 1122-1123.  Following *Gladstone*, the *Havens* Court held that if, as HOME alleged, defendants' steering practices "perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered an injury in fact," and, therefore, has standing to pursue its claim.  *Id.*

Similarly, Plaintiffs assert, ASM has suffered an injury in fact since, as a result of the improper use of a personal restraint upon a student at Parchment, it had to expend resources which otherwise it would not have needed to expend to address the use of restraint at Parchment, thereby impairing ASM's ability to advocate for and to provide education and training to individuals with autism spectrum disorder.  (Pls.' Br. Opp'n Defs.' Mot. Dismiss Second Am. Compl. at 9-12.)

Besides asserting that the language of the ADA and the Rehabilitation Act evidences Congress' intent to define standing as broadly as permitted under Article III, Plaintiffs fail to address or even refer to the specific language of these statutes.  The Supreme Court has explained, however, that "[a]lthough standing in no way depends upon the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted."  *Warth*, 422 U.S. at 500, 95 S. Ct. at 2206.  "The actual or threatened injury required by Article III may

21

exist," the Court continued, "solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Id*. (internal quotation marks omitted). "Essentially," the Court explained, "the standing question in such cases is whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id*; *see also*, *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.,* 165 F.3d 221, 223, 226, (3rd Cir. 1998) (noting that, in considering whether retailers had standing under § 43(a) of the Lanham Act to bring false advertising claims against manufacturers of products that compete with those the retailers sell, the issue the court needed to address was whether the retailers had "statutory standing – that is, whether Congress intended parties in . . . [the retailers'] position to have standing to sue under § 43(a)").

Preliminarily, although ASM asserts that it has standing to pursue this claim in its own right under both the ADA and the Rehabilitation Act, since courts are to interpret the ADA and the Rehabilitation Act consistently, the Court will consider ASM's claims under the acts together, as the results will be the same under both acts. *See MX Group*, 293 F.3d at 332 (considering both an ADA claim and a Rehabilitation Act claim together, as both acts are interpreted consistently with one another); *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731 (9th Cir. 1999) (noting that Congress has instructed that both the ADA and the Rehabilitation Act are to be interpreted consistently).

Unlike § 812 of the FHA, the ADA does limit the class of plaintiffs who may bring an action under the Act. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. Title II allows "any person alleging discrimination on the basis of disability in

violation of section 12132" to bring an action.  42 U.S.C. § 12133.  Title II does not expressly allow an organization to bring an action against a public entity on the theory that it itself has suffered an injury.

The Sixth Circuit has held that an organization may bring a claim under Title II of the ADA. *MX Group*, 293 F.3d at 335.  For the organization to have statutory standing to maintain a claim under the ADA, however, it must allege that "it has been discriminated against on the basis of its association with a disabled person."  *Id.*; s*ee also Baaske v. City of Rolling Meadows,* 191 F. Supp. 2d 1009, 1015 (N.D. Ill. 2002) (noting that "courts have allowed organizations that serve disabled persons to sue public entities under Title II to assert claims that the public entity discriminated against the organization based upon its association with disabled persons"); *United States v. City of Charlotte*, 904 F. Supp. 482, 486 (W.D. N.C. 1995) (concluding that "an organization of or for disabled individuals may file suit under the Rehabilitation Act if . . . the group has been discriminated against because of its association with the disabled . . . .").

In *MX Group*, plaintiff, MX Group, Inc., which was "in the business of providing drug treatment through the use of methadone," sought to open a methadone clinic in Covington, Kentucky.  293 F.3d at 328.  After looking at several potential buildings, the plaintiff found what it considered to be a suitable location and entered into a lease agreement with one of the owners of office space in the building.  *Id*. at 329.  Plaintiff applied for and was issued a zoning permit.  *Id*. "Another owner of an office in the building where the clinic was to be located" appealed the decision to issue the zoning permit to the Board of Adjustment.  *Id*.  "The Board of Adjustment voted to overrule" the decision to issue the zoning permit.  *Id*. at 330.  Thereafter, plaintiff attempted to obtain approval for the placement of a methadone clinic at another location in the city.  *Id*.  Covington then amended its zoning code, which effectively foreclosed plaintiff's ability to locate a methadone clinic

23

in the city.  *Id*. at 330-331.  Plaintiff then filed an action under Title II of the ADA and the Rehabilitation Act against Covington, alleging that Covington discriminated against it because of its association with its potential clients, who are individuals with disabilities, by both "refusing to issue a zoning permit to it so that it could open a methadone clinic in the [c]ity . . . [and] by amending the city's zoning ordinance to completely prohibit the clinic from opening anywhere in the city."  *Id*. at 328.

In considering whether plaintiff had standing to maintain its claim, the court noted that the regulations issued by the Department of Justice implementing Title II of the ADA provide that "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."  *Id*. at 334 (quoting 28 C.F.R. § 35.130(g)). "In adopting these regulations," the court explained, "the Department of Justice was following congressional intent, in that Congress directed that Title II should be read to incorporate the provisions of Titles I and III, which expressly 'define discrimination to include conduct directed at an entity based on its relationship or association with disabled persons.'" *Id*.[5]  "In addition," the Court noted, "the appendix to the regulations explain that 'the individuals covered under this paragraph are any individuals who are discriminated against because of their known association with an individual with a disability." *Id*. (citation omitted).  "For example," the appendix explains, it would violate the act "for a local government to refuse to allow a theater company to use a school auditorium on the grounds that the company had recently performed for an audience of individuals

---

[5] Title I defines discrimination to include the "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.  42 U.S.C. § 12112(b)(4).  Similarly, Title III makes it discriminatory to deny accommodations "to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E).

with HIV." *Id.* (quoting 28 C.F.R. pt. 35, App. A to 28, § 35.130(g)).  In *MX Group*, the court held that because plaintiff "presented evidence that it was denied a zoning permit because it cares for and/or associates with individuals who have disabilities," it had standing to prosecute the suit on its own behalf.  *Id.* at 335.

In contrast, in *Popovich v. Cuyahoga County Ct. Com. Pl., Dom. Div.*, 150 F. App'x 424, 426 (6th Cir. 2005), the court concluded that plaintiff, Lauren Popovich, who alleged that her rights under the ADA and the Rehabilitation Act had been violated based on her association with her father, a qualified individual with a disability, did not have standing to pursue her claims.  Prior to plaintiff's filing of her case, she "was the subject of a custody suit filed by her mother against her father in the Cuyahoga domestic relations court."  *Id.* at 425.  During the course of the custody proceeding, plaintiff's mother filed a complaint against plaintiff's father alleging domestic violence. *Id.*  As a result, the domestic relations court issued a protective order that prohibited plaintiff's father from visiting plaintiff.  *Id.*  "Meanwhile, the custody litigation was drawn out for some two years due to a continuing dispute over the court's obligation under the ADA to provide hearing-assistance facilities for the plaintiff's father."  *Id.*

Plaintiff claimed that the Common Pleas Court refusal to accommodate her father during the custody proceedings denied her access to her father for about five years.  *Id.* at 426.  Plaintiff relied upon *MX Group* in asserting that she had standing to maintain her claim that she was denied rights (her opportunity to visit her father) based on her association with a qualified individual with a disability.  *Id.*  The court noted that plaintiff's reliance on *MX Group* to establish her standing to sue was misplaced.  *Id.*  The court explained that, unlike the treatment center in MX Group, which was denied a permit to operate, plaintiff had "not been denied access to or participation in any of the public services covered by Title II."  *Id.*  "In other words," the court explained, plaintiff, "although

25

allegedly deprived of her father's companionship because of delays in her custody case" did not

suffer "an 'ADA injury,'" and, therefore, did not have standing to maintain this claim.  *Id.*

Similarly, in *Micek v. City of Chicago*, No. 98 C 6757, 1999 WL 966970 (N.D. Ill. Oct. 4,

1999), the district court dismissed the plaintiff's complaint that he had standing to bring a suit under

the ADA on the basis of his association with his son, a qualified individual with a disability, where

the plaintiff did not suffer an ADA injury.  In *Micek*, Wayne Micek, a Chicago police officer, filed

a claim for insurance health benefits through Humana Health Plan, Inc. seeking coverage of speech

therapy for his son, John, who was born with significant hearing loss.  *Id.* at *1.  Humana denied

coverage.  *Id.*  Although Micek grieved the denial of benefits, Humana sustained the denial.  *Id.*

Micek then sued the city under Title II of the ADA.  *Id.*  Micek alleged that  the City "consistently

excluded coverage of therapeutic services for persons with permanent . . . but improvable disabilities

while providing coverage of therapeutic services for non-disabled persons with comparable

conditions," in violation of the ADA.  *Id.* (internal quotation marks omitted).  Micek asserted that

he had standing to pursue this claim based on his association with his son, a qualified individual with

a disability.  *Id.* at *3.  Specifically, Micek argued that he had suffered a "direct economic impact

because of his association with his" son in that he had incurred "thousands of dollars in

uncompensated treatment for" him.  *Id.*  The district court noted that although Micek was correct in

asserting that "the ADA allows non-disabled individuals to bring claims of discrimination based on

their association with disabled individuals," for non-disabled plaintiffs to have standing, the court

explained, they must claim that they "were themselves discriminated against or singled out in a

discriminatory way due to their association with disabled persons."  *Id.*  Micek, the court noted,

suffered only an indirect injury and could not claim that the City discriminated against him or singled

him out in a discriminatory way due to his association with his disabled son.  *Id.*  Because Micek

"suffered no cognizable . . . injury sufficient to gain standing to sue" under the ADA, the Court granted the City's motion to dismiss. *Id.* at *4.

Plaintiffs' argument that ASM has suffered an injury in fact because it had to expend resources to address the improper use of a personal restraint upon a student at Parchment is insufficient to confer it standing to maintain this suit. "Not every entity that is being tangibly harmed by . . . [an ADA violation] has standing to sue under" the ADA. *W.G. Nichols, Inc. v. Ferguson et al.,* No. CIV. A. 01-834, 2002 WL 1335118, at *15 (E.D. Pa. Jun. 7, 2002). "This is so not due to the operation of any judicially fashioned standing limitation, but rather because Congress itself has limited the class of parties on which . . . the ADA bestows rights." *Id.* For an organization to bring an action in its own right, the organization must have been discriminated against or denied a benefit conferred by the ADA or the Rehabilitation Act because of its association with a qualified individual with a disability. *MX Group*, 293 F.3d at 335; *Popovich*,150 F. App'x at 426; *Baaske,* 191 F. Supp. 2d at 1015; *Micek,* 1999 WL 966970, at *4; *City of Charlotte*, 904 F. Supp. at 486 (concluding that "an organization of or for disabled individuals may file suit under the Rehabilitation Act if . . . the group has been discriminated against because of its association with the disabled . . . ."). Plaintiffs do not allege that ASM was discriminated against or denied a benefit conferred by the ADA or the Rehabilitation Act because of its association with a qualified individual with a disability. Rather, the injury ASM claims it suffered is only an indirect injury resulting from the allegedly improper use of a personal restraint upon an autistic student at Parchment High School. Because ASM did not suffer an ADA injury, it does not have standing to maintain this claim.[6]

---

[6] The Court notes that even if an organizational plaintiff could have standing where it suffered, not direct discrimination or denial of a benefit conferred by the ADA because of its association with a qualified individual with a disability, but rather only an indirect injury as a result of an ADA violation, it is not evident that Plaintiffs' complaint demonstrates that it suffered a tangible injury as a result of the alleged improper use of a restraint upon an autistic student at Parchment. Plaintiffs complaint asserts that from February 1, 2004, through January 31, 2005, it responded to 309

### III.  CONCLUSION

Because Plaintiffs' allegations fail to establish that they have standing either as representatives of their members or constituents or, with respect to ASM, in its own right, the Court will grant Defendants' motion to dismiss Plaintiffs' complaint.


Dated:  May 26, 2006                              /s/ Gordon J. Quist
                                              GORDON J. QUIST
                                        UNITED STATES DISTRICT JUDGE

---

requests for information, provided 40 referrals, and trained 54 residents of Kalamazoo county, addressing the negative effects of using physical restraints on students with autism. (Second Am. Compl. ¶¶ 10-11.)  The only reference to Parchment, however, is that in January and August of 2004, ASM wrote to its membership about the use of personal restraints at Parchment.  (*Id.* at ¶ 13.)  It is unlikely that one would conclude, based upon this allegation, that the alleged improper use of a restraint upon an autistic student at Parchment "perceptibly impaired" ASM's ability to advocate for and to provide education and training to individuals with autism spectrum disorder.  *See Havens*, 455 at 379, 102 S. Ct. at 1124.